Filed 2/26/13  U.S. Bank Nat. Assn. v. Lane CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| U.S. BANK NATIONAL ASSOCIATION,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JAMES LANE et al.,<br><br>    Defendants and Appellants. | A132059 & A132386<br><br>(San Francisco City & County<br>Super. Ct. No. CGC05446170) |

## INTRODUCTION

In "All the President's Men," Deep Throat advises investigative reporter Bob Woodward to "follow the money."  We do so in this case to resolve a labyrinthine subprime loan scheme from the pre-2008 recession era.

U.S. Bank sued to collect a debt of $1 million after the property that was collateral for the loan was sold free and clear of a lien.  Due to an error in the legal description of the property in the deed of trust, the lien had been erroneously recorded on a different property.  A jury found for U.S. Bank, and the debtors, coconservators of the Estate that owned the property, appeal.  They argue the undisputed evidence shows (1) the loan was made to the prior conservator, in her individual capacity, and (2) U.S. Bank was not a holder in due course.  They also argue the "one form of action rule" of Code of Civil Procedure section 726 barred the action against them.

We find substantial evidence to support the jury's findings that U.S. Bank's predecessor in interest entered into a contract with the prior conservator, in her representative capacity, for a mortgage loan on an estate property.  We also find

1

substantial evidence to support the jury's finding that U.S. Bank was a holder in due course. Finally, we find the trial court properly denied defendants' motion for judgment notwithstanding the verdict, because substantial evidence supports the conclusion that the exception to Code of Civil Procedure section 726's one form of action rule applied here. Therefore, we will affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

*The Parties*

Plaintiff and respondent U.S. Bank National Association, as Trustee for Credit Suisse First Boston Adjustable Rate Mortgage Trust 2004-1 (U.S. Bank), is the holder of a mortgage loan made to Alice Lane by loan originator First City Funding (FCF). The promissory note was signed by Alice Lane and was purportedly secured by a deed of trust on a property located at 2148 Pine Street in San Francisco, California. However, because the recorded deed of trust was defective, when that property was subsequently sold, the mortgage was not paid off. U.S. Bank then sued the defendants for collection of the debt.

Defendants and appellants are the current coconservators of the Elizabeth G. Jamerson Estate (the Estate) and cotrustees of the Elizabeth G. Jamerson Revocable Living Trust, James Lane (Lane) and Leonard Woolfolk (Woolfolk). During her lifetime, Elizabeth Jamerson acquired several parcels of residential real estate in San Francisco, California, including 2148 Pine Street. She had a stroke in 1991 and became incapacitated. Elizabeth's daughter, Alice Lane, was appointed sole conservator of her mother's estate in 1991 and served in that capacity until 2003, when Lane and Woolfolk took over as coconservators.[1] Elizabeth Jamerson died before trial. Alice Lane, along with her older brother, Lafayette Jamerson, and her younger sister Geraldine Woolfolk, are the beneficiaries of the Estate. Defendant James Lane is Alice's oldest son. Leonard Woolfolk is Geraldine's oldest son.[2]

---

[1] She was also conservator of her mother's person.

[2] The jury returned verdicts in favor of Alice Lane and Lafayette Jamerson, and they are not parties to this appeal. Geraldine Woolfolk was not involved in the litigation.

*The Relationship Of Alice Lane And Lafayette Jamerson To The Estate*

When Alice Lane became conservator of her mother's estate, the letters of conservatorship gave her the power to borrow money and give security for the repayment of debt on behalf of the Estate. Alice Lane understood that she was made conservator instead of her brother to avoid a potential conflict of interest, since he was going to be the contractor to the Estate. Nevertheless, Lafayette made all the decisions about loans and filled out all of the loan applications. He was the keeper of the checkbook, but not the signer. He would pay the bills out of his Jamerson Contractors account and get reimbursement from the Estate account. Every payment out of the Jamerson Contractors account was for the benefit of the Estate. "All the money went into the conservatorship coffers." The loans were made for the Estate; it was not his intent that Alice would be personally responsible for paying back the notes.

Barbara deVries was appointed temporary conservator by the court after Alice Lane failed to file a court-ordered accounting. Ms. deVries served in that capacity from June 16, 2003 to November 19, 2003 when Elizabeth's grandsons were appointed to succeed her as temporary successor conservators of the Estate. Initially, Ms. deVries had difficulty getting information from Alice Lane, Lafayette Jamerson, and the loan servicers, but she eventually discovered that "Ms. Lane had in effect ceded all responsibility for management of the estate to her brother, Lafayette Jamerson," and had "signed off on loans arranged by Mr. Jamerson substantially increasing the debt on five of the estate's seven properties" to the point that "[t]he outstanding indebtedness on those properties now exceeds the market value of the properties."

The parties agree that at the time Lane and Woolfolk took over as coconservators, the Jamerson Estate was in dire financial shape: the rental properties were in poor condition and unable to produce sufficient income to service the debt on them.[3]

---

[3] Mark Lane, James Lane's brother, worked for Lafayette Jamerson doing construction work on the Estate's properties for 10 years starting in 1991. During that time, Lafayette made repairs, but renovations were slow because the City would not approve the work done that was not to code. When Mark left his uncle's employ in 2001,

3

On January 14, 2004, Lane and Woolfolk were appointed as permanent coconservators. The appointment gave them the same powers to handle Estate affairs, including making loans and disposing of property, as Alice Lane had previously enjoyed. It was James Lane's practice to handwrite his name, but not the titles conservator or trustee, when signing documents in his capacity as representative of the Estate.

*Lafayette Jamerson's Relationship With First City Funding*

FCF was a small mortgage bank that funded its own loans through lines of credit with other financial institutions, such as GMAC. FCF was started by the late Mitchell Stewart and Nurit Petri, and specialized in making alternative or low documentation, subprime loans, which it then sold to investors.[4] The underwriting was done by Stewart himself on an ad hoc basis, depending on the investors' guidelines. He did not follow Freddie Mac or Fannie Mae underwriting requirements.

Beginning in 1999, Lafayette Jamerson initiated loans made through FCF on the various rental properties owned by the Estate, including 2148 Pine Street. FCF would FedEx the loan documents to his address (3200 Harrison Street) and he would then call Alice Lane to have her sign them. This was his pattern of doing business with FCF.

Settlement statements for the various loans made on Estate properties show that FCF charged the Estate very high loan origination and settlement fees. In addition, sometimes there were payments to the lender that were made in the same amounts as the cash to borrowers, and once there was a loan to Stewart himself, but Lafayette denied making the arrangements for that loan. Lafayette did not complain to anybody at FCF about the terms of the loans because "[b]eing a Black American I'm accustomed to paying more than would be normal." He agreed to huge interest reserves because "that's

---

2148 Pine Street had one tenant who had been there since the late 1960's and the upstairs was uninhabitable. All of the buildings were dilapidated, with leaking roofs and gutted interiors. When Lane and Woolfolk took over, Mark worked for them, and renovations moved quickly and were done properly.

[4] "Subprime loans are typically loans where people have less than stellar credit and usually less documentation, usually lower LTVs, and they're risk based price."

what the market was doing." Asked if he couldn't get another loan, he said: "If I changed my color I would."

Lafayette never told anyone at FCF Alice was personally obligated on the loans. He told FCF the loans were for the Estate; that's why he faxed them the conservatorship papers. No one at FCF ever told him they intended Alice Lane to be personally responsible for the loans. His understanding was that FCF intended to make the loans to the Estate.

*The Subject Loan*

In 2003, Lafayette Jamerson arranged for two loans on 2148 Pine Street, and two loans on 2140 Pine Street. In each case, one loan was for $1 million, and a new second mortgage was for $280,000. The cash to borrower from each of those transactions was $168,789.71, and $168,700.52 respectively, plus $86,334.

Alice Lane signed a deed of trust "as conservator of the [E]state" on the property at 2148 Pine Street on April 4, 2003 as security for a promissory note of $1 million, signed by her the same day. She understood that the deed of trust was a mortgage for the Estate on 2148 Pine Street. At the time she signed the deed of trust, she understood that it was for the Estate and not for herself, personally. In fact, that was true for every single document that was put before her in connection with any of the loans on the rental properties.

She also signed a second deed of trust, dated April 4, 2003 on 2148 Pine Street, to secure an additional indebtedness of $278,000; an adjustable rate note for $1 million at an interest rate of 5.875 on behalf of the Estate; an interest only addendum to the adjustable rate promissory note; and a balloon payment addendum to the note for 2148 Pine Street. It was Alice Lane's custom, when she was signing on behalf of the Estate, to simply sign "Alice Lane." It was not her practice to write out "as conservator." When she signed anything personally, she also signed "Alice Lane." She never put any of the money from any of the loans she signed into any of her personal accounts. She made sure all of the money went to the Estate, and as far as she knew, it did.

The deed of trust on 2148 Pine Street recorded at the request of the Chicago Title Company by the San Francisco Assessor Recorder is dated April 4, 2003 and names the borrower as "Alice R. Lane, as conservator of the Estate of Elizabeth G. Jamerson, a Conservatee." It is signed "Alice R. Lane." The property is described in "Exhibit 'A' " as "Lot 011, Block 0652." However, Lot 011, Block 0652 actually describes 2140 Pine Street. This property secured a different loan for $1 million, also made on April 4, 2003, to borrower "Alice R. Lane."

The preliminary title report prepared as of March 19, 2003 by Chicago Title Company regarding 2148 Pine Street correctly described the property in "Schedule A" as Lot 012, Block 0652. However, it describes the title as vested in "Alice R. Lane, a single women [sic]." An unrecorded deed of trust similarly describes the borrower as "Alice R. Lane, a single woman." It was signed by Alice R. Lane.[5][6]

Ruth Anderson was an escrow officer for FCF from 2003 to 2006. She is Nurit Petri's sister and Mitchell Stewart's sister-in-law. As an escrow officer, she handled recordable documents, sent them to the title company, estimated the closing statements, disbursed the loan proceeds, and prepared final statements. She was the escrow officer on four different Alice Lane escrow transactions, including 2148 Pine Street. She was the first person to receive a copy of the preliminary title report, and the copies of the preliminary title report she received did have a vesting in Alice Lane as conservator of the Estate. She did not remember seeing a preliminary report from Chicago Title Company at the time with vesting in "Alice Lane, a single women [sic]." The first time

---

[5] Anne Tramble, FCF's chief operating officer, did not know and could not explain why the two deeds of trust and two preliminary title reports were different. She had "no clue" why a facsimile face sheet from "Ruth" at FCF to "Robin" or "Derell" at Chicago Title Company regarding the "Alice Lane conservatorship" requested that Chicago Title Company "not show Item Number 9 re: authority of conservatorship."

[6] The preliminary title report and unrecorded deed of trust vesting title in "Alice R. Lane, a single woman," were in Wells Fargo Bank's original file, as stated in a Bailee Letter to U.S. Bank's attorneys.

she saw it was at her deposition. She had no idea why there were two preliminary title reports with different vesting information.

*FCF Sells the Subject Loan*

In addition to charging its borrowers large fees, FCF was in the business of reselling loans it originated to large mortgage companies which would, in turn, bundle them with other loans and sell them to securities companies for ultimate sale to public and private investors. Anne Tramble was in charge of "shipping" the loan to the investor, which means putting the documents in a certain order, and sending the file to a certain place for the investor's review.[7] After the investor reviewed it, FCF would get a list of documents or items from the investor that FCF needed to produce "in order to make the loan of investment quality to them." Typically, the investor engaged a third party to review the collateral file package (i.e., the note, deed of trust, allonge, corporate assignments, and preliminary title report or final title policy).

FCF entered into a seller's purchase and interim servicing agreement with DLJ Mortgage Capital, Inc. (DLJ)[8] pursuant to which DLJ bought loans that FCF originated. DLJ purchased four Alice Lane loans, including the subject loan, on June 6, 2003. It purchased a second loan to Alice Lane on 2148 Pine Street for $280,000 on June 13, 2003.

Bruce Kaiserman, president and managing director of CSFB, as well as vice president and board member for DLJ and executive vice president of Select Portfolio Servicing, Inc., reviewed the Alice Lane loan at the time DLJ purchased the loan from FCF and he "didn't see any issues or problems" with it. La Salle Bank, the document custodian for DLJ from 2001 to the present, already had the legal file in its possession before the purchase transaction was completed. The legal file contained the bogus note, mortgage, assignment, endorsement and evidence of title vesting title in the name of Alice R. Lane, a single woman.

---

[7] She supervised staff, but "did not touch these documents" personally.

[8] DLJ Mortgage Capital, Inc. is an investment bank which was acquired by Credit Suisse First Boston Mortgage Securities Corporation (CSFB), another investment bank.

*DLJ Sells The Loan To CSFB*

Pursuant to an assignment and assumption agreement dated September 1, 2004, DLJ sold 4,000 loans, including the Alice Lane loans, with an aggregate purchase price of more than $1 billion, 250 million, to CSFB for $10. The subject loan to Alice Lane for $1 million on the property at 2148 Pine Street was subsequently assigned from CSFB to a trust and ultimately securitized in a transaction that closed at the end of September 2004. That trust is The Adjustable Rate Mortgage Trust 2004-1 (plaintiff here). U.S. Bank was the trustee of the 2004-1 Trust.

*CSFB Deposits The Loan In The 2004-1 Trust*

The 2004-1 Trust is a real estate mortgage conduit established under the Internal Revenue Code to eliminate corporate level tax for the benefit of investors. Other parties to the transaction included a handful of loan servicers. The 2004-1Trust closed on September 29, 2004.

U.S. Bank's trust department provides trustees services for trusts organized by CSFB. Charles Pedersen, a vice president in U.S. Bank's corporate trust department and account manager in charge of U.S. Bank's portfolio of structured finance bond issues (such as mortgage backed securities), personally administered the 2004-1 Trust involved in this lawsuit.

When U.S. Bank agrees to act as trustee it signs a pooling and servicing agreement for managing the trust. On the closing date, Pedersen gets reports from the various loan custodians that tell him how many loan files they are holding and the dollar amounts of those loans. La Salle Bank sent U.S. Bank a certification that it was holding 2,885 loan files with a principle balance of $798,054,938.60. These loan files include the original promissory notes. Pedersen confirmed that the subject loan to Alice Lane on 2148 Pine Street was listed in U.S. Bank's electronic data file for the 2004-1 Trust. As part of La Salle Bank's certification, one William Dohr represented that " '[w]ith respect to these mortgage loans, such mortgage note has been reviewed by . . .' [La Salle Bank] 'and appears regular on its face and relates to such mortgage loan.' "

The 2004-1 Trust receives the collateral (i.e., the individual mortgage loans) through the certification of the custodians. In this case, the trust received the collateral from CSFB. Once the trust has the "collateral file in hand," U.S. Bank authorizes the "Depository Trust Company to go ahead and release the securities in exchange for that collateral."

Before Pedersen authorizes the trust to close, he makes sure that the number of loans La Salle Bank says it has corresponds to what the trust is supposed to be getting. He did that with the 2004-1 Trust, and it was an exact match. Pedersen then communicates his readiness to close to the closing office, and they put together "all the signature pages with the documents." When the closing office finishes its work, they call him and get him on a conference call with the Depository Trust Company. "[T]he Depository Trust Company will go through a listing of the securities that are being issued to the public and I will verify with them that I have the information I need to authorize them to release those securities." Pedersen authorized the Depository Trust Company to issue the securities certificates and close the trust on September 29, 2004. The closing date is the actual formation date of the 2004-1 Trust.

U.S. Bank is the nominal trustee, meaning that all the underlying collateral is assigned in its name, although the various servicers actually handle the individual loans. Prior to closing, it is required and fairly typical for a custodian bank to send U.S. Bank an exceptions report after it has reviewed the mortgage file. An exceptions report indicates certain documents in the trustee custodial file are not being held in the prescribed form. For example, holding a copy instead of an original is an exception. In this case, U.S. Bank received an exceptions report with respect to the Alice Lane loan on 2148 Pine Street. It showed there was a certified copy of the deed of trust in the file, not an original. There is a lag time between the time a document is sent to the county recorder's office until the time the original document, now recorded, is returned to the custodian. The lag time can be from six months to two years. Virtually every loan has this exception initially.

9

In addition, there was a preliminary title report rather than the actual title policy. Typically, title policies take three to six months to show up in the custodian's file. This exception also applies to virtually every loan in the trust.[9] Normally, Pedersen does not go back and check on individual loans, unless there is a lawsuit. The day-to-day administration of a loan is not handled by U.S. Bank as nominal trustee.

Pedersen was not privy to information about what was done in the way of any due diligence review of the Alice Lane loans. "You'd have to ask the buyer, the DLJ, whoever bought the loan." At the time of trial, there was no title insurance policy in the trustee mortgage file, nor was there an original of the deed of trust. Both the preliminary title report and the deed of trust showed title vesting in Alice R. Lane, a single woman. Other than in connection with the litigation, Pedersen had never come across any information indicating that the owner of the property was someone other than Alice R. Lane, a single woman.

Pedersen learned for the first time during cross-examination that there were two original notes and two original allonges[10] with different dates. Both referred to loans of $1 million to the same borrower, Alice R. Lane, for 2148 Pine Street. The deed of trust in the trustee mortgage file is different from the deed of trust that is attached to U.S. Bank's first amended complaint in that the property described in the document attached to the first amended complaint is Lot 011, whereas the property described in the deed of trust in the mortgage file is Lot 012. Also, the deed of trust attached to the first amended complaint, unlike the deed of trust in the trustee mortgage file, refers to the borrower as Alice R. Lane, as conservator for the Jamerson Estate. In addition, one deed of trust had two riders, and the other had three riders. Pedersen had not seen copies of either deed of

---

[9] Anne Tramble confirmed that trailing documents such as a recorded deed of trust and the final title policy are not available at the time the loan is sold. FCF rarely sent the trailing documents to their investors, who complained "vehemently."

[10] An allonge is an attachment to a legal document. An allonge occurs when there is not enough space on the original document to have signatures. It is meant to be an endorsement by a maker of a note.

10

trust prior to these proceedings and was at a loss to explain why U.S. Bank, as trustee for the 2004-1 Trust, had a different deed of trust from the one sued upon.

*DLJ's Due Diligence Review*

Kaiserman maintained that DLJ did a due diligence review of FCF before agreeing to do business with FCF. Further, every loan that FCF sold to DLJ was sent to a company called Lydian Data (Lydian) for review of the files to insure that each of the loans met the underwriting criteria.[11] One of DLJ's underwriting guidelines is that it will only purchase mortgages made to natural persons, with title in the property vesting in the name of the individual borrower. All of the Alice Lane loans were in the name of Alice Lane as an individual borrower. DLJ would not have purchased the loans otherwise. He first learned the properties associated with the Alice Lane loans were owned by the Jamerson Trust after the lawsuit was filed.

Kaiserman did acknowledge that as early as January 14, 2003, CSFB was informed of fraud allegations against FCF involving altered credit reports, falsified appraisals, altered title commitments and inflated balances of mortgages to be satisfied. CSFB investigated the matter and concluded that the allegations were likely a litigation strategy in a lawsuit involving FCF and GMAC, and "did not believe that the reasons were . . . fraud-based or appraisal-related." Kaiserman admitted DLJ negotiated a settlement agreement with FCF related to DLJ's requests that FCF repurchase loans that had defaulted within the first few months. At least as of March 25, 2004, DLJ and CSFB knew the four Alice Lane loans, including the one on 2148 Pine Street, were among the loans that had defaulted.

*The Disposition Of 2148 And 2140 Pine Street*

In a report to the court dated June 2004, coconservators Lane and Woolfolk proposed to "stop the cash drain on the Estate" in part by selling some properties and

---

[11] Anne Tramble confirmed Lydian did CSFB's "front end due diligence" for them. Lydian requested by fax that FCF send them documentation. Her understanding was that Lydian "reviewed the files [for CSFB] to make sure that what we've said that we were sending them is what we sent them."

thereby eliminating $16,101.40 in monthly mortgage payments. To avoid possible capital gains taxes, they proposed "utilize[ing] the 1031 Exchange program allowed by the IRS" which "entails taking any proceeds, or gain on sale, and reinvesting the proceeds in a like property or like properties." Under this plan, the properties at 2140 and 2148 Pine Street were among those slated for sale. On June 17, 2004, James Lane signed a coconservator's report that listed the Estate's then current assets and mortgages, including a mortgage of $1 million on 2148 Pine Street and a monthly mortgage payment of $6,031.77.

As of December 1, 2004, Wells Fargo Bank (dba America's Servicing Company) became the loan servicer of the $1 million loan secured by 2148 Pine Street pursuant to a pooling and servicing agreement with respect to the 2004-1 Trust. At that time, the loan was not current. The prior loan servicer was Select Portfolio Servicing, Inc. which forwarded to Wells Fargo funds it had received prior to the transfer, as well as correspondence it had received from Alice Lane.[12] Wells Fargo also received a copy of a letter dated October 20, 2004 from Select Portfolio Servicing, Inc. to Alice Lane informing her that she was in default on the note and deed of trust secured by 2148 Pine Street due to her failure to make the mortgage payments for September and October 2004. Wells Fargo also received a fax from Alice Lane informing the servicer that loan payments were being made by the new coconservators, Lane and Woolfolk, and attaching

_____

[12] Alice Lane testified that on December 14, 2004, she signed a letter which was faxed to America's Servicing Company. In it, she acknowledged that she had received information that certain loans, including the loans for 2148 and 2140 Pine Street, had been transferred from the previous loan servicer to America's Servicing Company as of December 1, 2004. She wrote to inform the new servicer that she was "the signer on the loan but the properties are owned by my mother." She attached letters of conservatorship for Lane and Woolfolk, the new coconservators, and gave her permission to have the servicer speak with them about the loans. She also indicated several payments on the loans had been sent to the previous servicer in early December that should have been forwarded, and she attached to the fax transmission copies of checks signed by Woolfolk as proof of payment, mailing and delivery. According to James Lane, the reason for faxing this information to the new loan servicer was "to try to find out what was going on with the loans, because we couldn't get any information from our uncle."

copies of checks totaling $12,063.54.  Wells Fargo subsequently received payments of $25,702.53 and $14,439.30 in January 2005.  Later payments were returned for insufficient funds.  After the last payment was reversed, Wells Fargo received no more payments.

At that point, the loan was considered to be in default and a breach letter was sent informing the borrower that the bank would proceed with foreclosure if the default was not cured.  When no further payments were made for 60 days, Wells Fargo would have instructed Loanstar Mortgage Services, L.L.C. (Loanstar), to "pull title to determine appropriate ownership" in connection with filing a notice of default.  A notice of default was filed on Wells Fargo's behalf by sub entity Loanstar with the assessor's office on April 29, 2005.  Unlike the deed of trust in Wells Fargo's file, which identified the owner of 2148 Pine Street as Alice R. Lane, a single woman, the notice of default identified the owner of 2148 Pine Street as Alice R. Lane, conservator for the Jamerson Estate.

After the notice of default is recorded, there is a waiting period of 90 days to see if there is a response to the notice of default.  If no response is received, the bank proceeds into foreclosure.  In this case, after the 90-day period had expired without the receipt of any funds, Wells Fargo proceeded with foreclosure.  However, "[u]nder the foreclosure action, it was determined that the deed of trust had not been recorded."  Wells Fargo was also informed by the Estate that the property was possibly being sold.  No foreclosure occurred and the loan secured by 2148 Pine Street was never repaid.  Subsequently, a demand for payment was made through local counsel, but no response was received.  The total pay-off amount through February 28, 2010 was $1,327,400.78.

On June 9, 2005, the Estate relinquished the property at 2148 Pine Street to an Internal Revenue Code section 1031 exchange escrow account with Investment Property Exchange Services, Inc., and had 45 days to identify a replacement property.  On June 12, 2005, Woolfolk was informed by someone at the escrow company handling the sale of 2148 Pine Street that there was no million-dollar deed of trust securing the loan that had been made in connection with 2148 Pine Street and that 2140 Pine Street had two million-dollar deeds of trust on its title.  Woolfolk signed the Seller's Escrow Instructions

13

on June 13, 2005. The property at 2148 Pine Street sold for $1,250,003.24. According to the Seller's Final Closing Statement, there was no pay-off for a $1 million loan. Instead, the net proceeds of $809,187.75 went into an Internal Revenue Code section 1031 investment property exchange account for the benefit of the Estate. Those proceeds, as well as some other assets, were used to purchase a rental property in Tulsa, Oklahoma for $5 million, with a $1,325,000 down payment.

In the meantime, the property at 2140 Pine Street went into foreclosure and was sold at a trustee's sale on August 22, 2005. The trustee was Loanstar, apparently the same sub entity used by Wells Fargo Bank to attempt foreclosure on the property at 2148 Pine Street.

*The Litigation*

On October 28, 2005, U.S. Bank, as trustee for the Trust 2004-1, filed suit against coconservators Lane and Woolfolk in their representative capacities, and Alice Lane, in both her individual and representative capacities, for collection of the note. The complaint alleged various equitable theories of recovery, as well as breach of contract against Alice Lane. A first amended complaint added a breach of contract claim against the Estate and its coconservators.

Defendants cross-complained for damages, restitution and rescission against U.S. Bank, FCF, an FCF appraiser, an FCF loan broker, Lafayette Jamerson, and others, alleging conspiracy to commit mortgage fraud, elder abuse, and unfair business practices by virtue of subprime, predatory and racially targeted lending and fraudulent loan applications, appraisals and loan documentation.

Trial by jury commenced February 3, 2010. On April 9, 2010, the jury returned a general verdict and special findings, as follows: (1) on U.S. Bank's breach of contract claim against the Estate, the jury found for U.S. Bank and awarded it $980,864.14; (2) on U.S. Bank's breach of contract claim against Alice Lane, the jury found for Alice Lane.

On U.S. Bank's claim to be a holder in due course, the jury's special findings were that: (1) a valid allonge was attached to the promissory note when it left the hands of FCF and thereafter; (2) U.S. Bank obtained the promissory note for value; (3) when U.S.

14

Bank obtained the promissory note it was free from apparent evidence of forgery or alteration, and did not appear so irregular and incomplete as to call into question its authenticity; (4) U.S. Bank obtained the note in good faith; (5) U.S. Bank obtained the promissory note without notice that it was overdue; (6) U.S. Bank obtained the promissory note without notice that it had been altered; and (7) U.S. Bank obtained the promissory note without notice that any party had a defense to payment.

With respect to the Estate's claim for conspiracy to commit fraud, the jury found that FCF and Out of BK.Com had participated in a conspiracy to defraud the Estate, but that Lafayette Jamerson, the appraiser, the loan broker, and U.S. Bank had not. The jury found by clear and convincing evidence that FCF and Out of BK.Com acted with oppression, fraud or malice.[13] The jury also found the cross-defendants had established a defense to the conspiracy claim by proving that the conspiracy was no longer ongoing by April 20, 2004, and that the Estate proved that it did not discover the facts constituting the conspiracy until after April 20, 2004, and could not have discovered those facts sooner.

With respect to the Estate's claims for conspiracy to commit financial elder abuse, the jury found FCF and Out of BK.Com had participated in such a conspiracy, but that Lafayette Jamerson and the two employees had not; by clear and convincing evidence, that FCF and Out of BK.Com acted with oppression, fraud, malice or recklessness; that Lafayette Jamerson had established a defense to the elder abuse claim by proving that the conspiracy was no longer ongoing by April 20, 2004; and the Estate proved it did not discover the conspiracy to commit elder abuse until after April 20, 2004, and could not have done so sooner. The jury awarded the Estate damages in the amount of $755,825.72.

Judgment in favor of Alice Lane against U.S. Bank was entered on June 7, 2010. Judgment in favor of U.S. Bank against the Jamerson Estate, and in favor of the Jameson Estate against FCF and Out of BK.Com, was entered on February 14, 2011. Defendants'

---

[13] Out of BK.Com was another company started by Mitchell Stewart and Nurit Petri. It operated out of the same offices as FCF and had the same employees.

motions for new trial (as to U.S. Bank and Lafayette Jamerson) and judgment notwithstanding the verdict (JNOV) were denied by order filed April 20, 2011.

Defendants timely appeal the judgment and the denial of the JNOV motion. This court ordered consolidation of the appeals.

## DISCUSSION

*Substantial Evidence Supports The Jury's Implied Finding That FCF Entered Into A Contract With Alice Lane, In Her Representative Capacity As Conservator Of The Jamerson Estate.*

*Standard Of Review*

Defendants Lane and Woolfolk assert this court should independently review the contract judgment against them de novo, rather than apply the substantial evidence rule, because, on the question whether FCF intended to contract with Alice Lane in her individual or representative capacity, the evidence adduced at the jury trial indisputably proved FCF intended to loan Alice Lane $1 million in her individual capacity. Defendants cite *California Assn. of Medical Products Suppliers v. Maxwell-Jolly* (2011) 199 Cal.App.4th 286 (*Maxwell-Jolly*) in support of the proposition that we should ignore the substantial evidence rule on appeal from a judgment rendered after a jury trial. We find the cited case is inapposite and does not support independent review in this case.[14] We will, therefore, review the jury's express and implied findings of fact under the

_____

[14] *Maxwell-Jolly, supra,* involved an appeal from a trial court's denial of a writ of mandate. The trial court had reviewed a trade group's challenge to administrative regulations promulgated by the California Department of Health Care Services. (*Id.* at p. 291.) In that context the Court of Appeal stated: "In reviewing [a petition for writ of mandate] under Code of Civil Procedure section 1085, a trial court's role generally is to 'determine whether the agency's action was arbitrary, capricious, or without evidentiary support, and/or whether it failed to conform to the law.' . . . [¶] In reviewing the trial court's ruling, ' " 'the appellate court may make its own determination when the case involves resolution of questions of law where the facts are undisputed.' " ' [Citation.] Also, '[w]hen administrative agency action is judicially reviewable under a substantial evidence standard, the rule for the reviewing trial court and appellate court is the same.' (*Agricultural Labor Relations Bd. v. Exeter Packers, Inc.* (1986) 184 Cal.App.3d 483, 492 [evaluating whether substantial evidence supported the conclusion that regulations were reasonably necessary under the APA].)" (*Maxwell-Jolly, supra*, 199 Cal.App.4th at pp. 302–303.)

16

familiar substantial evidence rule. Under that deferential standard, our review begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, to support the findings below. We view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor. And, we are not at liberty to reweigh the evidence or judge the credibility of witnesses. (*Tesoro del Valle Master Homeowners Assn. v. Griffin* (2011) 200 Cal.App.4th 619, 634, and cases cited therein.)

The evidence before the jury was theoretically susceptible of conflicting inferences on the question whether Alice Lane signed the loan documents in her individual or representative capacity. On the one hand, the unrecorded deed of trust vested title in Alice Lane as a single woman, and she signed everything simply as Alice R. Lane. On the other hand, the letters of conservatorship gave Alice Lane "[t]he power to borrow money and give security for the repayment thereof" without further order of the court. The evidence showed Alice Lane used her power as sole conservator to sign for loans that encumbered the Estate, but that it was her older brother who arranged for numerous loans on the various properties owned by the Estate through FCF, which he then presented to Alice Lane for her signature as conservator. This evidence gave rise to the reasonable inference that when Alice Lane signed and authorized the subject loan, she was acting in conformity with her usual practice and was once again acting in her representative capacity. And, of course, Alice Lane testified she signed the promissory notes and deeds of trust at issue in her capacity as conservator of the Estate and *not* in her individual capacity. She testified when she signed for the Estate, she always signed as Alice R. Lane, without adding conservator. Finally, the recorded deed of trust identified the borrower as "Alice R. Lane, as Conservator" of the Jamerson Estate.

Defendants maintain, however, that the alternate set of loan documents showing Alice R. Lane, a single woman, demonstrate indisputably there was "no intent *on FCF's part* to contract with the Jamerson Estate," and "the controlling intent here is FCF's." We disagree. Both Ruth Anderson and Ann Tramble disavowed any knowledge of how there came to be two sets of documentation, one for Alice Lane as conservator and one

17

for Alice Lane as a single woman. But there was evidence someone named Ruth at FCF faxed the letters of conservatorship to the title company with a facsimile cover sheet asking the title company to mask the conservatorship in the preliminary title report. Ruth Anderson, FCF's escrow officer, testified that all the title reports she received and processed on FCF's behalf indicated that Alice Lane as conservator was the borrower, not Alice Lane, as a single woman. And, it is undisputed that FCF obtained and recorded a deed of trust against a property owned by the Jamerson Estate, not by Alice Lane personally. Viewed as a whole, the evidence amply supported the inference that FCF intended to encumber Estate property, and did so by contracting with Alice Lane in her capacity as the conservator for the Estate, and that the phony "Alice R. Lane, a single woman" documents, which found their way into the collateral files of La Salle Bank, DLJ, Lydian, CSFB and ultimately U.S. Bank and Wells Fargo, were concocted by someone at FCF for the purpose of meeting DLJ/CSFB's underwriting requirement that the borrower be an individual.

Furthermore, the jury was separately instructed about contract formation.[15] Defendants do not argue on appeal these instructions were in any way faulty. Based on the instructions and the evidence before it, the jury was entitled to find credible Alice

---

[15] With respect to the Jamerson Estate and Alice Lane, the jury was instructed that the 2004-1 Trust claimed each of them "entered into a contract, called a promissory note, for a mortgage loan with First City Funding." The instruction informed the jury that contract formation requires, among other things, that "the parties agreed to the terms of the contract," and that if all of the elements of contract formation were not proved, "a contract was not created." The jury was also instructed that "[a]n agent is one who represents another, called the principal, in dealings with third persons. Such representation is called agency." In addition, the jury was specifically instructed that the 2004-1 Trust "claims that Alice Lane, as Conservator, was acting within the scope of her authority and was an agent of the Defendant Jamerson Estate at all relevant times." The jury was also instructed that "When Alice Lane signed the promissory note for the 2003 Subject Loan as 'Alice Lane' while she was Conservator of the Jamerson Estate, her signature was a valid signature on behalf of the Jamerson Estate. And, "[w]hen Alice Lane signed the promissory note for the 2003 Subject Loan as 'Alice Lane' without specifying her capacity as Conservator for the Jamerson Estate, her signature was also a valid signature for Alice Lane personally."

18

Lane's testimony that she signed the loan papers in her representative capacity; to infer reasonably that when Alice Lane signed the promissory note at issue, she was acting solely as an agent for the Jamerson Estate; and to further infer that when FCF contracted with Alice Lane, it understood that she was acting as an agent on the conservatorship's behalf and agreed to lend $1 million to the conservatorship, and not to Alice Lane personally. Substantial evidence supports the jury's general and special verdicts reflective of that conclusion.

In light of our resolution of defendants' contract formation claim, we need not discuss in detail defendants' argument there was insufficient evidence to support the jury's implied finding the Jamerson Estate ratified the contract after the fact. However, our conclusion would be the same as above, in any event. The jury was correctly instructed with respect to the elements of ratification. There was ample evidence adduced at trial from which the jury could infer that each of the elements was met: the Estate accepted the loan proceeds, made payments on the loan and, at best, was silent about being a party to the loan after it knew or should have known the owner of the loan believed the Jamerson Estate was a party to the loan. Substantial evidence supports the jury's general verdict.

*Substantial Evidence Supports The Jury's Determination That U.S. Bank Was A Holder In Due Course.*

Defendants argue that because CSFB knew FCF's loans to Alice Lane were in default at least as of March 25, 2004, that knowledge should be imputed to U.S. Bank. "As a matter of law and public policy, [CSFB] should not be permitted to launder this note by the artifice of depositing it in trust so as to manufacturer a holder in due course," i.e., U.S. Bank. Defendants again argue that de novo review obtains, citing *Maxwell-Jolly, supra*, 199 Cal.App.4th at page 303. For the following reasons, we reject that contention and apply the substantial evidence rule.

The jury was instructed in accordance with Commercial Code section 3302 on the requirements of a holder in due course and defendants do not challenge the correctness of

19

those instructions.[16] Nor do they appear to dispute there was no evidence "that U.S. Bank itself had actual knowledge it was receiving fraudulent, overdue mortgages to hold in trust." Instead, defendants claim essentially that CSFB's guilty knowledge should be imputed to U.S. Bank because of its "close connection" with CSFB. Defendants acknowledge they "have found no authority" that so holds, and so they urge us to rely on "sound public policy" to "hold that good faith, for purposes of acquiring holder in due course status, cannot exist when one who knows an instrument is fraudulent and overdue conveys that instrument in a less than arm's length transaction." Defendants' public policy argument is better addressed to the Legislature and could result in the proverbial slippery slope under the circumstances of this case.

Defendants also argue U.S. Bank did not qualify as a holder in due course because it received duplicate original promissory notes. They argue, without citing to any authority, that the duplicate promissory notes were "so irregular . . . as to call into question [their] authenticity," apparently as a matter of law. (Com. Code, § 3302, subd. (a)(1).) We disagree because the apparent authenticity of the promissory note here was a question of fact for the jury. The jury was specifically asked: "When plaintiff 2004-1 Trust obtained the promissory note was it free from apparent evidence of forgery or alteration, and did it appear so regular and complete so as not to call into question its

---

[16] The jury was instructed: "The 2004-1 Trust claims that, regarding the promissory note for the 2003 Subject Loan, it is a 'holder in due course' of the note. To prove that it is a 'holder in due course' the 2004-1 Trust must prove all of the following: [¶] 1. That the promissory note when issued or when transferred to the 2004-1 Trust did not bear such apparent evidence of forgery or alteration or was not otherwise so irregular or incomplete as to call into question its authenticity, and, [¶] 2. That the 2004-1 Trust took the promissory note [¶] a. For value; [¶] b. In good faith; [¶] c. Without notice that it was overdue or had been dishonored; [¶] d. Without notice that the promissory note contained an unauthorized signature or had been altered; and, [¶] e. Without notice that any party to the promissory note had a defense to payment of the note or a claim in recoupment; and, [¶] 3. That a valid allonge was affixed to the promissory note when the promissory note left the hands of First City Funding and thereafter. [¶] If you find that 2004-1 Trust has proven these elements as to any defendant, then the only defenses you may consider are fraud in the inducement and duress in signing the note. Otherwise you must consider all of defendants' defenses." The jury found each of these elements true.

20

authenticity?" The jury answered that question affirmatively, and that answer was amply supported by the testimony of Bruce Kaiserman and Charles Pedersen who looked at the duplicate promissory notes and were not alarmed by them. The evidence adduced at trial supported the inference there were two sets of loan documents, but only one set—the one identifying the borrower as Alice Lane, a single woman—was sent on to DLJ and others in the investor chain of possession, and that the documentation sent to them was sufficiently ordinary looking that it fooled everyone, duplicate promissory notes notwithstanding.

Defendants argue that U.S. Bank does not qualify as a holder in due course because the name "Alice R. Lane," and the phrase "A Single Woman," are misaligned on the unrecorded version of the deed of trust included in the loan documents that FCF sold to CSFB and that CSFB deposited in the trust. According to defendants, the misalignment proves the name and the description "*must* have been placed on this document at different times," thereby demonstrating an apparent forgery, alteration or other irregularity as to call into question the document's authenticity. The existence of duplicate promissory notes, as well as typographical errors in spelling and spacing, were brought out at trial, but did not persuade the jury these minor irregularities were sufficient to render the bogus promissory note apparently inauthentic. The jury's conclusion is supported by substantial evidence.

Finally, defendants argue U.S. Bank is not a holder in due course because the allonge included in one of the duplicate promissory notes had "no staple holes at all, nor any other indicia that it was ever attached to anything." However, one of the duplicate original promissory notes *did* have an allonge stapled to it. Defendants note they repeatedly and strenuously objected to the introduction of the duplicate promissory note. However, their objections were overruled, and they do not argue on appeal that the court's ruling was in error. The promissory note with the allonge stapled to it was admitted into evidence for the jury's consideration. The jury was specifically asked: "Was a valid allonge attached to the promissory note when it left the hands of First City Funding and thereafter?" The jury answered that question in the affirmative. Evidence

21

admitted at trial which the jury found credible supported that finding. The fact there was contradictory evidence does not make it insubstantial. In sum, substantial evidence supports the jury's findings that U.S. Bank qualified as a holder in due course.

*Code Of Civil Procedure Section 726 Did Not Bar U.S. Bank's Lawsuit*

Defendants argue U.S. Bank should not have been allowed to proceed on its contract claim against defendants because U.S. Bank could have corrected the error in the recording of the deed of trust against the wrong property and, if it had done so, it would have been required to foreclose against the deed of trust and sell the encumbered property to satisfy the debt. Defendants unsuccessfully made this same argument in a motion for JNOV. Once again, defendants argue that the standard of review is de novo, claiming the facts are undisputed. We disagree under the applicable standard of review.

" 'Well-settled standards govern judgments notwithstanding the verdict: "When presented with a motion for JNOV, the trial court cannot weigh the evidence [citation], or judge the credibility of witnesses. [Citation.] If the evidence is conflicting or if several reasonable inferences may be drawn, the motion for judgment notwithstanding the verdict should be denied. [Citations.] A motion for judgment notwithstanding the verdict of a jury may properly be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict. If there is any substantial evidence, or reasonable inferences to be drawn therefrom in support of the verdict, the motion should be denied. [Citation.] [Citation.] The same standard of review applies to the appellate court in reviewing the trial court's granting [or denying] of the motion. [Citations.] Accordingly, the evidence . . . must be viewed in the light most favorable to the jury's verdict, resolving all conflicts and drawing all inferences in favor of that verdict." [Citation.]' (*Osborn v. Irwin Memorial Blood Bank* (1992) 5 Cal.App.4th 234, 258–259[.])" (*Ajaxo Inc. v. E\*Trade Group Inc.* (2005) 135 Cal.App.4th 21, 49.)

Defendants' argument, that U.S. Bank is barred from suing and recovering on the promissory note by the "one form of action rule," is based on Code of Civil Procedure section 726, subdivision (a). That section states in relevant part: "There can be but one

form of action for the recovery of any debt or the enforcement of any right secured by mortgage upon real property . . . which action shall be in accordance with the provisions of this chapter.  In the action the court may, by its judgment, direct the sale of the encumbered real property . . . ."

Defendants do not dispute that the subject loan "was apparently supposed to be secured by 2148 Pine Street."  And they agree the deed of trust recorded as security for the subject loan "contained an apparent error."  Defendants posit that because of the error, the subject loan became "attached to the 2140 Pine Street [property]."  Defendants reason from this premise that 2140 Pine Street was thus encumbered by two loans (totaling $2 million) that were co-equal in priority, leaving 2148 Pine Street unencumbered.  (*First Bank v. East West Bank* (2011) 199 Cal.App.4th 1309, 1315.)

Defendants assert:  "There was no evidence that U.S. Bank took any action to stop the sale of 2148 Pine Street, or any action to reform the deed of trust securing this loan."  Thus, when U.S. Bank foreclosed on 2140 Pine Street to satisfy Loan 03-5570, U.S. Bank deliberately "wipe[d] out its co-equal security on [the subject] Loan."  The nub of this argument appears to be that, having thus voluntarily divested itself of 2140 Pine Street, the asserted security, by its own act or neglect, U.S. Bank waived the right to proceed on the note.  (*Pacific Valley Bank v. Schwenke* (1987) 189 Cal.App.3d 134, 140–141; *Ghirardo v. Antonioli* (1996) 14 Cal.4th 39, 48.)

Defendants' argument flies in the face of the facts and the law.  Civil Code section 1624, subdivision (a)(6) requires that the security interest in a deed of trust be stated in writing with sufficient clarity to identify it.  (4 Miller & Starr, Cal. Real Estate (3d ed. 2003) Deeds of Trust, § 10:17, p. 70.)  The property description can be in an incorporated document, as it was here.  But the reference to the document must be clear and unequivocal.  (*Calvi v. Bittner* (1961) 198 Cal.App.2d 312, 316; *Saterstrom v. Glick Bros. Sash etc. Co.* (1931) 118 Cal.App. 379, 381 (*Saterstrom*).)  " ' "To be valid on its face, a deed must contain such a description of the real property thereby intended to be conveyed as will enable the property to be readily located by reference to the description."  [I]f the writing itself does "not furnish the means whereby the description

may be made sufficiently definite and certain readily to locate the property, then the instrument must be held void, since the imperfections of the description cannot be supplied through evidence extrinsic to the writing itself without running up against the positive mandate of the rule that a conveyance of real property must be in writing." ' [Citation.]" (*Saterstrom, supra,* at pp. 380–381.)

The recorded deed of trust identified 2148 Pine Street by street address and 2140 Pine Street by legal description, rendering the reference less than clear and unequivocal. If the disconnect in the deed of trust between the street address and the legal description of the property was sufficient to defeat the creation of a perfected security interest in 2148 Pine Street, logic dictates that the same disconnect likewise defeated the creation of a perfected security interest in 2140 Pine Street. In this case, despite the ambiguity in the deed of trust, it was erroneously recorded against the property identified in the legal description. Contrary to defendants' assertion, the subject loan did not become "attached to" 2140 Pine Street by virtue of the defect in the deed of trust any more than it became "attached to" 2148 Pine Street by virtue of the same defect. Instead, the defect in the deed of trust gave rise to an equitable mortgage in 2148 Pine Street, as we discuss below.

The evidence adduced at trial established the parties *intended* to secure the subject loan with a deed of trust on 2148 Pine Street, and never intended to secure *that* loan with a deed of trust on 2140 Pine Street. Defendants acknowledge placing the legal description of 2140 Pine Street in the deed of trust for 2148 Pine Street *was a mistake*. The law is clear, " ' "[a] promise to give a mortgage or a trust deed on particular property as security for a debt will be specifically enforced by granting an equitable mortgage. [Citations.] An agreement that particular property is security for a debt also gives rise to an equitable mortgage even though it does not constitute a legal mortgage. [Citations.] If a mortgage or trust deed is defectively executed, for example, an equitable mortgage will be recognized. [Citations.] Specific mention of a security interest is unnecessary if it otherwise appears that the parties intended to create such an interest. [Citations.]" [Citation.]' " (*Clayton Development Co. v. Falvey* (1988) 206 Cal.App.3d 438, 444–445 (*Clayton*).)

*Clayton* provides a similar fact pattern, and the court's analysis of the issues raised by such facts is instructive. In that case, the purchaser, Falvey, decided to buy a condominium as an investment property. He executed a first deed of trust to secure a note in favor of Pacific Federal Savings and Loan (Pacific Federal), and a second deed of trust to secure an additional note in favor of Clayton Development Company, the vendor. However, because the vendor's agent "gave the escrow company an incorrect legal description the second trust deed actually encumbered a condominium unit other than Falvey's. Clayton and Falvey did not know of the mistake." (*Clayton, supra*, 206 Cal.App.3d at p. 442.) Falvey subsequently defaulted on the notes to Pacific Federal and Clayton. When the mistake was finally discovered, Falvey was asked to execute a new deed of trust containing the correct legal description, but did not do so. Clayton then sued Falvey on the note. Some months later, Pacific Federal foreclosed on the property. (*Ibid.*) In the lawsuit, Falvey asserted the Code of Civil Procedure sections 726 and 580b[17] as affirmative defenses. In a motion for summary judgment, Falvey argued that "the second deed's mistaken legal description created an equitable mortgage favoring Clayton with the result that direct action on the second note was barred under section 726's one-action rule and section 580b's antideficiency provision." (*Clayton, supra,* at p. 443.) The Court of Appeal agreed, and affirmed the trial court's grant of summary judgment.

The court found that the parties clearly "intended their deal to be a secured transaction. Indeed, Clayton concedes '[t]he debt was to have been secured by a 2nd

---

[17] Code of Civil Procedure section 580b provides in relevant part:
"(a) No deficiency judgment shall lie in any event for the following:
[¶] (1) After a sale of real property or an estate for years therein for failure of the purchaser to complete his or her contract of sale.
[¶] (2) Under a deed of trust or mortgage given to the vendor to secure payment of the balance of the purchase price of that real property or estate for years therein.
[¶] (3) Under a deed of trust or mortgage on a dwelling for not more than four families given to a lender to secure repayment of a loan which was in fact used to pay all or part of the purchase price of that dwelling, occupied entirely or in part by the purchaser."

trust deed on real property sold to Defendants by Plaintiff.' Falvey executed a trust deed intended and believed by all parties to encumber the property purchased. The trust deed's description of the property was faulty. However, given the parties' undisputed intent, the erroneous trust deed constituted a security interest in the property and an equitable mortgage was created." (*Clayton, supra,* 206 Cal.App.3d at p. 444, citing *Kaiser Industries Corp.* v. *Taylor, supra*, 17 Cal.App.3d at pp. 350–353.) The court rejected Clayton's argument that since the deed of trust was defective, Falvey merely held unsecured notes that were not subject to Code of Civil Procedure section 580b, which refers only to security transactions. (*Clayton, supra,* at p. 444, fn. 3.)

Recognizing that both "[Code of Civil Procedure sections] 580b and 726 are part of a statutory scheme protecting defaulting borrowers from being disadvantaged by lenders," and that an equitable mortgage is a form of security interest, the court held that "[b]oth statutes should be read as applying to equitable, as well as legal, mortgages. . . . If in fact an equitable mortgage exists, the creditor has no choice of remedy. [Citation.] Construing section 580b as not embracing equitable mortgages would undermine the purpose of the antideficiency statutes by permitting the creditor an election between either enforcing an equitable lien and being treated as a secured creditor or circumventing the antideficiency statutes and suing on the underlying note if such better suited the creditor's needs. Such construction here would result in Clayton receiving an unmerited windfall simply because Clayton's predecessor's agent fortuitously misdescribed the property to be encumbered. Accordingly, we hold section 580b bars a deficiency judgment where, as here, an equitable mortgage exists securing payment of the balance of a real property purchase money note favoring the vendor." (*Clayton, supra*, 206 Cal.App.3d at p. 445.)

Although the *Clayton* court did not decide to what extent Code of Civil Procedure section 726 also applied to the facts before it, the court recognized there was an exception to the general rule that "when the parties intend a secured transaction and an equitable mortgage is created, the creditor is required to follow the procedure specified in section 726 and foreclose on that security. [Citation.] Where the debtor successfully raises

26

section 726 as an affirmative defense, the creditor must exhaust the security before he may obtain a money judgment against the debtor for any deficiency. [Citation.] *However, where the security has been exhausted or rendered valueless through no fault of the creditor, the creditor may bring action on the debt '[o]n the theory that the limitation to the single action of foreclosure refers to the time the action is brought rather than when the trust deed was made, and that if the security is lost or has become valueless at the time the action is commenced, the debt is no longer secured.* [Citations.]' " (*Clayton, supra,* 206 Cal.App.3d at pp. 445–446, italics added.) The court noted that in the case before it, "the security became valueless only after Clayton commenced its action on the note," but it declined to decide "[w]hether under these circumstances section 726 might not be an obstacle to Clayton's proceeding with its action on the note." (*Clayton, supra,* at p. 446; see also *Brown v. Jensen* (1953) 41 Cal.2d 193, 197; *Security-First Nat. Bank v. Chapman* (1939) 31 Cal.App.2d 182, 194; *Pacific Valley Bank v. Schwenke, supra,* 189 Cal.App.3d at pp. 140–141; *Bank of America v. Graves* (1996) 51 Cal.App.4th 607, 611.)

Defendants acknowledge the exception to the one form of action rule set forth above. They maintain, however, the exception does not apply here because "U.S. Bank was aware [of the] error well before the intended security, 2148 Pine Street, was sold." They point to evidence that Loanstar, a sub entity of Wells Fargo, filed a notice of default on the subject loan on April 29, 2005, and that Loanstar "pulled title" before doing so and learned of the property's true ownership. They infer that in that process, U.S. Bank must have learned through its agents "that there was no security interest encumbering 2148 Pine." We disagree.

The *Clayton* rationale teaches that the legal misdescription of the property known as 2148 Pine Street in the deed of trust created an equitable mortgage in 2148 Pine Street, because the evidence overwhelmingly proved that FCF and the Jamerson Estate intended to create a security interest in that property for the subject loan of $1 million, and there is no evidence that the parties ever intended to encumber 2140 Pine Street with a second million-dollar loan. "The trust deed's description of the property was faulty. However,

27

given the parties' undisputed intent, the erroneous trust deed constituted a security interest in the property and an equitable mortgage was created." (*Clayton, supra*, 206 Cal.App.3d at p. 444.)

First Bank v. East West Bank, supra, 199 Cal.App.4th 1309, cited by defendants for the proposition that the two liens recorded on a single property at the same time have equal priority, does not compel a different result. In that case, the borrower and the two lenders *intended* both deeds of trust would be secured by the same property. (*Id.* at pp. 1311–1312.) Here, the parties never intended to create two security interests (worth $2 million) in 2140 Pine Street. They intended to create and, through the implication of an equitable mortgage did create, a security interest in 2148 Pine Street.

In this case, unlike *Clayton*, the facts adduced at trial established the equitable lien holder, U.S. Bank, never had the chance to foreclose on property intended as security because the borrower sold the property before it could do so. Alice Lane testified that on December 14, 2004, she signed a letter which was faxed to America's Servicing Company. In it, she acknowledged she received information that the loan on 2148 Pine Street had been transferred to a new loan servicer, America's Servicing Company, as of December 1, 2004, and she informed the new servicer of the change in conservators, and also stated that several loan payments had been sent to the previous servicer in early December. She attached to the fax transmission copies of checks signed by Woolfolk as proof of payment, mailing and delivery. Erin Hirzel Roesch, an employee of Wells Fargo, which serviced the subject loan under the name of America's Servicing Company, acknowledged receiving Alice Lane's fax. Wells Fargo subsequently received more payments on the loan in January 2005, but later payments were returned for insufficient funds, after which Wells Fargo received no more payments.

At that point, the loan was considered to be in default and a breach letter was sent informing the borrower that the bank would proceed with foreclosure if the default was not cured. When no further payments were made for 60 days, a notice of default was entered on Wells Fargo's behalf by sub entity Loanstar.

At some point, Roesch was told the property might be sold. A notice of default on the subject loan was recorded on April 29, 2005. Roesch testified that after the notice of default is recorded, there is a waiting period of 90 days to see if there is a response to the notice of default. If no response is received, the bank proceeds into foreclosure. In this case, Roesch testified, Wells Fargo waited for the 90-day period to expire, and then proceeded with the foreclosure. Only then was it determined that the deed of trust held in their files (i.e., the deed of trust naming the borrower as Alice R. Lane, a single woman) had never been recorded.

But by July 28, 2005 (i.e., 90 days after April 29th), 2148 Pine Street had long since been sold and the proceeds disbursed. On June 9, 2005, the Estate had relinquished the property at 2148 Pine Street to an Internal Revenue Code section 1031 Exchange escrow account with Investment Property Exchange Services, Inc. On June 13, Woolfolk signed the seller's escrow instructions, knowing that no lien had been recorded against 2148 Pine Street. According to the Seller's Final Closing Statement, there was no pay-off for a $1 million loan. By June 30 or July 1, 2005, the net proceeds of $809,187.75 had gone into an Internal Revenue Code section 1031 investment property exchange account for the benefit of the Estate.

Although U.S. Bank did not try to stop the sale, the foregoing facts and the inferences therefrom provide substantial evidence in support of the conclusion that it would have been futile for U.S. Bank to pursue reformation of the deed or foreclosure of the property, even if it could have done so. Even though Alice Lane had told Roesch that 2148 Pine Street was owned by her mother's conservatorship estate, that assertion was not confirmed until Loanstar "pulled title" for the purpose of filing the notice of default on April 29, 2005. But, so far as this record shows, at that point Wells Fargo had not yet discerned the recorded deed (naming the borrower as Alice Lane as Conservator of the Estate) had been recorded against a different property. The implication of Roesche's testimony was U.S. Bank did not learn that the deed of trust in its files (naming Alice Lane as an individual borrower) had never been recorded, because U.S. Bank did not look into its file until 90 more days had passed. By that time, it was too late. To the

extent that the evidence of "pulling title" may have provided a conflicting inference, we are bound by the substantial evidence rule to credit the reasonable inferences that favor the judgment.

U.S. Bank was not required to seek reformation of the deed after the sale of the property. It did not commence suit until October 2005, well after the sale of the property. Substantial evidence supports the trial court's implied finding that foreclosure would have been an idle act because the security had already become worthless, through no fault of the lender, and therefore the exception to Code of Civil Procedure section 726's "one form of action" rule applied. U.S. Bank's suit to collect the debt was not barred, and the motion for JNOV was properly denied. (*Brown v. Jensen, supra*, 41 Cal.2d at p. 197.)

### DISPOSITION

The judgment is affirmed.

_____
Marchiano, P.J.

We concur:


_____
Margulies, J.

_____
Dondero, J.

30